# BALTIMORE & OHIO RAILROAD COMPANY *v.* MURPHY.

### PATENTS; SPECIFICATIONS AND CLAIMS; INFRINGEMENT.

1. Where an inventor seeking a broad claim which is rejected, in which rejection he acquiesced, substitutes therefor a narrower claim, he cannot be heard to insist that the construction of the claim allowed shall cover that which has been previously rejected.

2. A claim as finally allowed must be interpreted with reference to the rejected claims as well as to the prior state of the art; and it cannot be so construed as to cover either what was rejected or disclosed by prior devices; but this rule does not apply where there is a mere change in the wording of the claim to more clearly express the patentable invention.

3. In a suit for infringement of patents relating to metal car roofs, it was *held*, reversing a decree of the lower court, that, in view of the prior state of the art at the date of the alleged invention for which the patents were granted, and in view of existing letters patent,

that the inventions described and claimed in the patents did not constitute patentable inventions, and that the patents were void.

No. 2376.   Submitted April 3, 1912.   Decided April 22, 1912.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia, holding an equity court, granting an injunction restraining the defendant from infringing certain patents.                    *Reversed.*

The facts are stated in the opinion.

*Messrs. Munday, Evarts, Adcock & Clarke, Mr. James Whitmore,* and *Messrs. Hamilton, Yerkes, & Hamilton,* for the appellant.

*Mr. Melville Church, Mr. James A. Carr,* and *Mr. 'A. M. Holcombe,* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This appeal is from a decree in the supreme court of the District granting an injunction to restrain the appellant, Baltimore & Ohio Railroad Company, defendant below, from infringing patents 554,287 and 915,205.

The patents sued upon both relate to metal car roofs. We will first consider patent No. 554,287, three claims of which are involved, namely, the 1st, 2d, and 4th. The 1st claim reads as follows: "1. A car roof consisting of plates having inverted U-shaped flanges on three of their sides, whereby the flanges of the plates when assembled engage each other at the ridge and side seams in such manner that the top and side flanges on said plates alternately overlap and underlap each other, locking the plates in position; substantially as described." The 2d claim differs from the 1st in that the words, "without the use of fastening at the ridge and suitable fastenings for the plates at the eaves," are inserted before the words, "substantially as de-

scribed," that is to say, there is the addition of the element of "fastenings for the plates at the eaves" and the express elimination of fastening at the ridge.    Claim 4 is here reproduced: "4. In a car roof, the combination with the sheeting, of roof plates having inverted U-shaped flanges on three of their sides, which engage with each other, corner caps for the intersection of the ridge and side seams, walk-sleepers, a ridge pole, and a bolt which passes through the walk-sleeper, corner-caps, intersection of the seams, sheeting, and ridgepole; substantially as described."

An examination of the state of the art at the time the appellee, Peter H. Murphy, applied for the patent here under consideration, will now be helpful.    Metal car roofs had then been known for many years, and Murphy himself had been an inventor in that line.    In 1889 he obtained patent No. 414,069. In that patent, as in the present, the roof was formed of a multiplicity of metal sheets supported on the wooden roof frame of the car, and there, as here, each sheet extended from the ridge of the car to the eaves.    The plates were made with flanges all around the edges, the flange on one end and one side being U-shaped, and the flange on the other end and other side being flat.    These plates were laid along the roof so that the U-shaped flange fitted over the straight or flat flange, making a tight joint.    The corners at the ridge where the plates joined together were provided with caps having U-shaped flanges which fitted tightly upon the plate flanges, and extended "some distance from the corners along all the four flanges or ribs." (See specification.)    The flange of the eaves end of the plates extended downward and overlapped the edge of the wooden sheeting.    The use of nails, screws, or other fastenings passing downward through the plates was dispensed with.

In 1893 Murphy obtained patent No. 489,322, for an alleged improvement over the patent last above mentioned, the subject-matter relating to the manner of holding down the metal sheets at the eaves of the roof.

There are several other patents to which we will advert later.

The application for patent No. 554,287, therefore, related

to a well-developed art, and it is at once apparent that Mr. Murphy fully appreciated that he had done nothing more than make certain small changes in the construction already in use. His specification had reference to the claims accompanying it, and must, of course, be now construed with reference to the vicissitudes through which these claims passed. As originally filed the application contained thirteen claims. The 1st covered broadly the combination in a car roof with plates overlapping and underlapping each other, forming a lock, a means for holding the plates in position at the ridge and eaves. The 2d contained the limitation that the plates shoud be unperforated. The 3d was for a combination including plates joined together by standing seams, a running board, means for securing the running board, which means also was required to hold the plates in position at the ridge, and clamps for securing the plates at the eaves. The 5th was for a roof plate, as an article of manufacture "formed with inverted U or V shaped flanges on three of its sides, or on two sides and one end." Every one of the thirteen claims was rejected by the Examiner, who ruled that the 1st and 3d claims were met by the Murphy patent of 1889 or 1893, to which reference has been made, the Jennings patent of 1891, No. 446,780, and the patent to Couch and Otterson of November 3, 1891, No. 462,375. He also cited references applicable to claim 2. Claims 4, 5, 6, and 7, relating to the inverted U-shaped flange feature on three sides of the plate, he held were anticipated by Murphy's prior patents, saying: "Applicant has done no more than fold the upright flange shown in his previous patents down as the flange on the opposite side is folded, and this, it is held, does not involve invention." Claim 8, which required the channel in the corner-cap to have greater dimensions than the plate flanges, was held to be met by Murphy and Jennings, both of whom showed caps that fitted snugly. Claim 9, for a combination comprising a running board, sleeper, corner-cap, roof plates, ridge, and a bolt passing through or between said parts for binding them together, was held met by the references above cited. It is unnecessary to mention the other claims. Thereupon Murphy canceled claim

1, and inserted a claim in its place which required the plates to have flanges on three sides, and that could be laid so that the flanges on the different plates would overlap and underlap each other. Various other amendments were made. Again all the claims were rejected. The Examiner, in speaking of the feature of having the cap fit loosely, said: "It requires no invention to make the caps and flanges to fit loosely instead of snugly to allow for expansion or strain." In this rejection the claimant acquiesced by canceling all his claims and submitting nine others, of which the claims now under consideration were a part. Claim 6 of the new claims again required the channel of the corner-caps to be of greater dimensions than the seams or ribs, "permitting the sheets and caps to have an independent movement." This claim was rejected, as were claims 4 and 6. The applicant acquiesced in this rejection, and took his patent covering six claims. He now advances the rather startling contention that the effect of the rejections and amendments in the Patent Office was not to limit, but to broaden, his claims. Speaking of claim 1 he says: "Claim 1 of the patent involves exactly the same patentable idea as original claim 1 and the claim 1 which it replaced. It is not the same claim narrowed or limited; but the same claim broadened by the omission of the fastenings and with a fuller specification of the means whereby the mere overlapping of the roof sheets would interlock them and form a complete covering." We cannot accept this contention.

Let us now analyze claim 1 as finally allowed. We have seen that the claim originally included plates which overlapped and underlapped each other, forming a lock and means for holding the plates in position at the ridge and eaves; that this claim was rejected and amended so as to include plates having U-shaped flanges on three sides, and that this claim was rejected and the present claim inserted. We have seen that every claim covering the feature of having U-shaped flanges on three sides of the plate was rejected, and that the applicant acquiesced in that rejection.

If anything is well settled in patent law it is the principle

"that where an inventor, seeking a broad claim, which is rejected, in which rejection he acquiesces, substitutes therefor a narrower claim, he cannot be heard to insist that the construction of the claim allowed shall cover that which has been previously rejected." *Computing Scale Co.* v. *Automatic Scale Co.* 204 U. S. 609, 617, 51 L. ed. 645, 650, 27 Sup. Ct. Rep. 307. It is equally well settled that the claim as finally allowed must be interpreted with reference to the rejected claims as well as to the prior state of the art, and that it cannot be so construed as to cover either what was rejected or disclosed by prior devices. *Hubbell* v. *United States,* 179 U. S. 77, 45 L. ed. 95, 21 Sup. Ct. Rep. 24. We quite agree with appellee that where there is a mere change in the wording of the claim to more clearly express the patentable invention, the above rule does not apply; but obviously the amendments in this case were for a different purpose. Much was sought; little obtained. In view of the rejections above noted, it cannot now be claimed that there is a single new element in the combination set forth in claim 1 as finally allowed. To save the patentability of that claim, therefore, we must look to the arrangement of the elements; and attention well may here be directed to the fact that there really is no patentable distinction between claims 1 and 2, for it is perfectly obvious that claim 1 was framed with reference to the prior state of the art, which fully disclosed suitable eaves fastenings. Of course, the plates, even though locked together, would not remain upon the roof unless fastened at the eaves. Upon what theory, therefore, were these two claims allowed? Certainly not upon the theory now advanced by appellee that, even though the plates are laid along one side of the roof and then along the other, there will be such a locking of them together as to fall within the terms of these claims. This was the precise arrangement shown in the prior patents, and, moreover, one which would not lock the plates at the ridge, within the meaning of these claims, since all of the top or ridge flanges on one side would be over the top of the plates on the other side. If we look to Fig. 9 of the patent, it at once becomes apparent just what kind of locking arrangement was intended to be covered

by these claims. In this figure, which is the only one showing the arrangement of the plates, we discover that the plates are there laid so that there is an interlocking joint formed by the upper corners of two mutually opposite pairs of sheets, that is to say, the lapping is such that each of the four meeting sheet corners is held down by all of the other three, each sheet corner having its top flange overlapping and its side flange underlapping, and *vice versa.* In the arrangement thus shown and aptly described in the specification, the flanges of the plates alternately overlap and underlap each other. It is true, as suggested by appellee, that the specification contains the statement that this particular arrangement of the plates is not essential, "as the plates may be laid in regular rows, that is, by laying one side complete and then laying the other." But this statement has entirely lost its force by reason of the changes in the claims which were made necessary by the action of the Patent Office. Assuming, therefore, that these claims cover and protect the locking arrangement shown in Fig. 9, it must necessarily follow that they are not infringed by the appellant, since it is admitted that in its construction the old arrangement, and not the new, has been followed.

This brings us to the 4th claim. The elements in this claim are old. The Patent Office evidently overlooked in the Jennings patent, No. 446,780, issued in 1891, the feature of anchoring the running-board saddle to the ridge board of the car by a through bolt passing through the saddle and corner-cap and between the sheet corners, which results in fastening the running board to the car ridge without perforating the roof sheets, except, of course, at their corners. In the argument at bar it was not insisted that his anchorage feature is new, but it was contended that the particular form of the plates mentioned in the claim is new, and that a new result is reached in the combination. We have, we think, demonstrated that this contention is without merit, the Examiner having expressly ruled that the slight change made in the plates over the prior art did not constitute invention. In that ruling appellee acquiesced, and is now estopped to urge patentable novelty in

this element of his combination. Each element of the combination, therefore, being old, arranged in the same old way, and performing substantially the same function theretofore performed, it follows that the claim is void.

In patent No. 915,205, it is contended that claims 1, 2, 3, 4, and 5, covering the roof as an organized whole, and claims 6, 7 and 11, for the roof sheets as articles of manufacture, and claims 8 and 12, for the blank out of which the particular roof sheet mentioned is formed, are infringed. While these claims are numerous and apparently involved, they will be found, upon inspection, to be very easily understood. Stripped of verbiage and expressed in plain terms, they relate merely to a particular style of corner, and differ only in slight details from the old drip-pan corner, a corner theretofore well known in the car-roofing art. We will here review the contents of the file wrapper, having in mind that the most essential features of the alleged invention are the requirement that the corners formed by the flanges shall be *integral,* and that the surplus metal at said corners, lying along the face of said flanges, shall be cut away. The Examiner found that the first-named feature contained nothing new over Murphy's prior patent, No. 554,288, issued in 1896, which showed the integral corner, as did also that of Link, No. 665,642. As to the last-named feature, the Examiner ruled that "if the top flanges were provided with rebent portions, such portions would of necessity be cut away at the corners to permit of the bending of the integral upstanding flanges." All the claims were rejected. A new claim was thereupon substituted for the first and second claim added. Again all the claims were rejected. Amendments were again made, which resulted in the same action by the Examiner. Again amendments were made and again all the claims were rejected. Thereupon the two affidavits executed by the employees of the applicant were submitted, in which it was in substance set forth that it had required considerable effort to construct outside roof sheets with solid corners; "that the final solution of the problem was the outcome of considerable study and very numerous experiments which involved the loss of much material

and time." Although these affidavits fail specifically to set forth the nature of the difficulties encountered, they evidently raised a doubt in the mind of the Examiner and the patent was allowed.

Upon the taking of testimony appellant introduced evidence tending to controvert the statement in these affidavits. This evidence appellee made no attempt to meet. The only advantage in having an integral or solid corner is to prevent any possible leakage, which could not occur in a nonintegral corner except under very unusual conditions. There was nothing new in this idea, as pointed out by the Patent Office. Monteer showed such a corner in his patent of February, 1893, No. 491,-120. Such a corner was also shown in the Murphy patent of February, 1896, No. 554,288. All that the patentee did was to cut away the top of the U-shaped flanges near the corners, cut off the surplus metal, and bend his corner. He found in the Williams & Richey patent, granted in May, 1885, No. 318,438, a blank for a baking-pan corner, which is almost a duplicate of the blank upon which he has obtained a patent. To be sure, that blank was for a deep tin. Reduce its dimensions one half, however, and a blank substantially like appellee's results. In the Williams & Richey specification they point out that the blank shown by them will "work up into a pan having its sides and ends a little inclined outward from the plane of its bottom," and proceed to point out that deviations from this form "necessary to the construction of rectangular pans of greater or less depth or length or width or 'flare' of sides and ends, or either or any, will be so obvious to anyone skilled in the art that but little further explanation or direction, if any, will be necessary."

It is suggested in the brief of counsel for appellant that possibly the affidavits filed by Mr. Murphy, and which apparently secured the allowance of his patent, may have had reference to the difficulty encountered in forming the integral corner in the bending machine which Murphy patented in 1906. This suggestion is quite plausible.

We are fully convinced that the claims of patent No. 915,-

205, involved in this suit contain nothing patentable over the prior art. It is therefore unnecessary to inquire whether appellant's construction falls within those claims. It follows that the decree must be reversed, with costs, and the cause remanded for further proceedings.          *Reversed and remanded.*